**CHASAN & WALTON, LLC**
ANDREW M. CHASAN, ISB #2100
E-mail: andrew.chasan@chasanwalton.com
TIMOTHY C. WALTON, ISB #2170
E-mail: timwalton2000@hotmail.com
P.O. Box 1069
Boise, Idaho 83701
Phone: 208-345-3760
Fax: 208-345-0288

**DUMAS & VAUGHN, LLC**
GILION C. DUMAS, ISB #8176
E-mail: gilion@dumasandvaughn.com
3835 NE Hancock St., Ste. GL-B
Portland, OR 97212
Phone: 503-616-5007
Fax: 888-396-3226
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| Mark Doe 14, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MOUNTAIN WEST COUNCIL, INC., BOY SCOUTS OF AMERICA, p/k/a/ ORE-IDA COUNCIL, INC., BOY SCOUTS OF AMERICA, an Idaho corporation,<br><br>Defendant. | Case No. 1:21-cv-000306<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br>*Fraud and Constructive Fraud*<br><br>**Jury trial demanded** |

COMES NOW the above-named Plaintiff, by and through his attorneys of record, and for causes of action against the above-named Defendant, alleges as follows:

/ / /

/ / /

/ / /

**COMPLAINT - 1**

## IDENTITY OF THE PARTIES

1.

Plaintiff's true name is not stated in this Complaint to protect him from further emotional harm and to protect his privacy because this Complaint alleges intimate details of child sexual abuse.  His true name will be provided to Defendant, and the Court as may be required by law.

2.

Plaintiff Mark Doe 14 is an adult male resident of Idaho.  At all relevant times, he was a resident of Idaho.  He was born in 1965.

3.

Defendant Mountain West Council, Inc., Boy Scouts of America ("Defendant Mountain West Council"), p/k/a Ore-Ida Council, Inc., Boy Scouts of America is an Idaho non-profit corporation with its principal place of business in Boise, Idaho.  Defendant Mountain West Council previously operated as the Ore-Ida Council, Inc., Boy Scouts of America and Snake River Council, Inc., Boy Scouts of America, which merged on or about March 1, 2020 to form Defendant Mountain West Council, Inc.  On information and belief, the Mountain West Council now also includes some Scout districts and troops that previously might have been under the jurisdiction of the Tendoy Area Council, Inc., which has been an inactive entity since 1994.  At all relevant times, Defendant Mountain West Council operated under the actual control of Boy Scouts of America ("BSA") to provide a youth program for boys in Idaho known as "Boy Scouts" or "Scouting," and was an actual or apparent agent of BSA.

/ / /

/ / /

/ / /

**COMPLAINT - 2**

## JURISDICTION AND VENUE

4.

This Court has jurisdiction over Plaintiff's claims under 28 U.S. Code § 1334(b) because this case arises in or is related to *In re: Boy Scouts of America and Delaware BSA, LLC*, U.S. Bk. Ct. (Delaware Dist.) No. 20-10343 and *Boy Scouts of America v. A.A., et al.*, U.S. Bk. Ct. (Delaware Dist.) No. 20-50527 ("BSA's Chapter 11 bankruptcy case") for at least the following reasons:

a.      Plaintiff asserts claims to recover monetary damages based upon tortious actions or omissions committed by BSA agents or otherwise related parties;

b.      BSA and the non-debtor Defendant named in this case share an identity of interest such that a claim against this Defendant may be, in effect, a claim against BSA's estate;

c.      On information and belief, BSA and non-debtor Defendant, in many instances, are parties to shared insurance;

d.      The claims and allegations against non-debtor Defendant are inextricably intertwined with the claims and allegations asserted against BSA in its bankruptcy such that the case is "related to" BSA's Chapter 11 case.  The claims and allegations arise out of a common nucleus of operative facts and raise substantially similar questions of law; and Defendant is named as a "BSA Related Party" in BSA's Chapter 11 bankruptcy case at "Notice of Fifth Stipulation by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period [Adv. Docket No. 178] (Adv. Proc. Case No. 20-50527 (LSS) (Bankr. D. Del.)).

**COMPLAINT - 3**

5.

Venue is proper in this judicial district under 28 U.S. Code § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here.

## ORGANIZATION OF SCOUTING

6.

Defendant invited boys, including Plaintiff, to participate in Scouting, including Scouting activities such as camping and hiking trips.

7.

BSA was and is a vertically-integrated organization. The national BSA organization was at the top of the structure. BSA national established goals, standards, and rules for leaders at the lower levels to follow, and BSA national relied upon local employees and volunteers to implement its goals, standards, and rules. The lower levels of BSA included sponsoring organizations (like the United Methodist Church), local councils (like Defendant Council), troop committees, and troops.

8.

Local councils, generally at the state or regional level, such as Defendant, jointly administered and controlled, with BSA, the Scouting program at the state/regional level.

9.

Defendant and BSA organized Scouting into "troops" at the local level. Defendant and BSA operated all troops relevant to Plaintiff's allegations in Idaho. These troops were officially sanctioned BSA troops that participated in activities such as group meetings, camping, hiking, and earning "Merit Badges."

/ / /

**COMPLAINT - 4**

10.

Defendant approved, trained, and supervised adult Scout volunteers (including troop leaders known as "Scoutmasters" and "Assistant Scoutmasters") and paid Scout employees.

11.

Organizations, such as local churches, "sponsored" local Scout troops by assisting with selecting adult Scout volunteers for the troops, supervising those adult Scout volunteers, providing meeting locations for the troops, creating additional rules applicable to the troops, ensuring that BSA's and the local councils' rules and guidelines were followed, and providing additional support and resources for the troops.

12.

Defendant and BSA selected and approved David Oakley as an adult Scout volunteer for Troop 33 in Gooding, Idaho.  At all relevant times, Oakley was an actual or apparent agent of Defendant and BSA.

13.

Defendant authorized and empowered Oakley to perform all the duties of troop leaders, including but not limited to providing instruction, counseling, and physical supervision of Scouts; educating Scouts in morality, patriotism, character-building, obedience, and various other life skills; mentoring and befriending Scouts; and enforcing rules governing Scouts' participation in Scouting.  Defendant knew that, as part of his duties and expectations as a troop leader, Oakley would be in a position of trust, confidence, respect, and authority over Scouts, including Plaintiff.

/ / /

/ / /

**COMPLAINT - 5**

14.

Defendant retained the right to control, and had actual and apparent control of the means, methods, and physical details of troop leaders' performance of the duties described above.  As part of his duties as a troop leader, Oakley used his position to gain the trust and confidence of Plaintiff to spend large periods of time alone with Plaintiff, or with Plaintiff and other Scouts, with no other adults supervising.  Oakley performed his duties as troop leaders in connection with his agency relationship with Defendant, and his duties generally were of a kind and nature that he was required to perform as a troop leader.

**DEFENDANT'S KNOWLEDGE OF SEXUAL ABUSE IN SCOUTING**

15.

Beginning as early as the 1910s, BSA regularly received reports and information from its local Councils, like Defendant Council, and agents, of adult Scouting volunteers and professional Scouters sexually abusing Scouts.  Based on these reports, BSA created a file system now known as the "Ineligible Volunteer" files ("IV files") or "Volunteer Screening" files to attempt to track a variety of transgressions by adult volunteers, including volunteers that sexually abused Scouts.  BSA categorized IV files according to the type of transgression committed, labeling IV files that contained allegations of child sexual abuse as "Perversion" files.  The IV Files generally contain detailed factual information about the circumstances under which child sexual abuse occurred in Scouting.  The number of IV Perversion files that still exists significantly underrepresents the actual number of IV Perversion files and of adult Scout leaders that molested Scouts for many reasons, including that BSA destroyed many of the IV files created before Plaintiff was abused, and because many children did not report their sexual abuse.

**COMPLAINT - 6**

16.

These IV Files were regularly utilized by local councils, including Defendant Council.

17.

The earliest existing IV File from Idaho is from Lewiston, Idaho in 1962.  The next existing IV File from Idaho is for Robert F. Elliott, from 1971, even though the IV File indicates Defendant knew of Elliott's dangerousness to Scouts by 1969.  Several other IV Files exist from the 1970s and early 1980s describing child sexual abuse occurring in Scouting in Idaho, based on information received from Idaho local councils like Defendant Council.  Based on the information in the IV Files, Defendant Council and BSA knew that child molesters were using Scouting to gain access to and gain the trust of Scouts, including Plaintiff, in order to molest them.

18.

Defendant and BSA had specific knowledge by 1969 of perpetrator Robert Elliott's sexual dangerousness to Scouts.  According to BSA's own IV File on Elliott, created in 1971, Elliott served in the Air Force, and Air Force officers warned the District Scout Executive in 1969 that Elliott should not be allowed to associate with the Boy Scouts of America.  Defendant admitted taking "no action." Defendant continued receiving reports on "numerous occasions" about Elliott's "unorthodox or strange behavior" throughout 1970.  Although Defendant supposedly tried to keep him away from "boy programs," Defendant did not remove him from Scouting or report him to law enforcement.  Defendant continued to receive reports about "very questionable situations involving Scouts" through 1971 until Defendant and BSA finally removed him from Scouting.

/ / /

**COMPLAINT - 7**

19.

Defendant and BSA also had specific knowledge by at least 1964 of perpetrator Larren Arnold's sexual dangerousness to Scouts.  An adult member of the Nampa 2nd Ward told Bishop Leon Hales that his son, a Scout in Troop 101, had been molested by Arnold, his Scoutmaster. Bishop Hales responded that he would "take care of it." A week later, Bishop Hale told the father that he had taken care of it.  Hales was a member of Defendant Council and BSA when this conversation took place.  Additionally, between 1971 and 1973, Arnold sexually abused another Scout in Troop 101.  At the time, the Scout reported his abuse to Bishop Elvin Hegstrom, Bishop of the Nampa Second Ward.

20.

 By the time Plaintiff joined Scouting, based on the incident reports in the IV Files generated by BSA's and local councils' volunteers, employees, and agents, as described above, as well as the allegations against Libey, Elliott, and Arnold as described above, Defendant and BSA knew that Scouting posed a danger to minor boys because there had been a longstanding, consistent, and widespread problem with adult volunteers sexually abusing Scouts.  Prior to Plaintiff's abuse, Defendant and BSA knew that at least a significant number of Scouts would be sexually abused by Scout leaders every year if Scouting remained structured as it was.

**DEFENDANT'S FRAUD**

21.

Defendant and BSA invited boys, including Plaintiff, to participate in Scouting and enter into a commercial relationship, which included Scouts paying an annual membership fee and other fees, and making required purchases, in exchange for participating in Scouting.  Defendant and BSA also created a relationship of trust and confidence with Plaintiff by inviting him to

**COMPLAINT - 8**

participate in Scouting and acting *in loco parentis* to Plaintiff during Scouting activities such as camping and hiking trips.  Defendant and BSA undertook responsibility for the safety of Scouts such as Plaintiff and delegated that responsibility to Scout volunteers acting under Defendant and BSA's control.

22.

Prior to and during Plaintiff's abuse, Defendant and BSA actively concealed their knowledge that abusers had been joining Scouting for decades to gain access to and sexually abuse boys.  When BSA added a volunteer to the IV File list for sexually abusing boys, BSA routinely instructed the Scout Executives of local councils, like Defendant Council, and other local employees and volunteers to keep secret the reason the volunteer had been dismissed and the existence of the IV Perversion file system.  Many times, BSA then deleted, or instructed local employees or volunteers to delete, the volunteer's name from unit applications and rosters.  BSA also had a policy of limiting the use of the IV File system to a limited number of employees at the BSA national office and certain local employees and volunteers.  BSA had no policies requiring or encouraging its employees to disclose the existence or functioning of the IV File system to the Scouting community and the general public, thereby limiting the use of the IV File system to report allegations of wrongdoing by adult Scout volunteers.  Defendant Council, despite knowing of the IV File system and BSA's lack of policies and transparency, also had no policies requiring or encouraging local employees and volunteers to disclose the existence or functioning of the IV File system.

23.

Defendant and BSA also actively concealed their knowledge that Scout leaders in Idaho had been accused of sexually abusing Scouts or other boys prior to Plaintiff's abuse.

**COMPLAINT - 9**

24.

Prior to and during Plaintiff's abuse, Defendant and BSA engaged in a decades-long public relations campaign to represent to the government, the public, and the Scouting community, including Plaintiff and his family, that Scouting was a safe and morally upright program that was physically, emotionally, and spiritually beneficial for boys.  Defendant and BSA additionally represented that the adult Scout leaders, who were their agents, were appropriate and trustworthy mentors and leaders for young boys.

25.

Prior to and during Plaintiff's abuse, Defendant and BSA conveyed the misrepresentation that adult Scout leaders were appropriate and trustworthy mentors and leaders by selecting, approving, and retaining certain men as adult Scout volunteers.  Defendant and BSA further conveyed the misrepresentation that Scouting was a safe and morally upright program for boys by failing to enact or enforce common sense child abuse policies, acknowledge the existence of child sexual abuse in Scouting, or otherwise amend the Scouting program to reduce the prevalence of child sexual abuse in Scouting.

26.

Prior to and during Plaintiff's abuse, BSA also conveyed the aforementioned misrepresentations through explicit language, such as in newspaper, magazine, radio, and television advertisements; news articles and other media spots; BSA-published publications; and annual reports to Congress.  As examples, BSA made specific statements in various editions of the *Boy Scout Handbook*, such as the Scout Oath and Scout Law.  In the 1965–1972 *Boy Scout Handbook*, the Scoutmaster is referred to as "a wonderful man" who goes on hikes and goes camping with the Troop, and who "is the friend to whom you can always turn for advice." BSA,

**COMPLAINT - 10**

*Boy Scout Handbook*, at 94 (7th ed., 3rd printing, 1967).  The 1972-1978 *Boy Scout Handbook*, BSA stated, "[o]ver there watching things is your Scoutmaster.  He's a great guy.  He gives hours of his time to you and the troop.  And do you know why?  Mostly because he knows Scouting is important to his city and nation.  Besides, he is interested in boys."  BSA, *Boy Scout Handbook*, at 9 (8th ed., 2nd printing, 1973).  This edition also told Scouts: "Your Scoutmaster is interested in and wants to know about you.  Only then can he help you to have fun in Scouting.  [Y]our Scoutmaster wants to know you better.  He wants to see what you have to bring to the troop.  Soon after joining you will have your first personal growth agreement conference.  Here you and your Scoutmaster will sit down for a talk.  Tell him about yourself.  Your Scoutmaster will probably ask about the things you like to do.  Your Scoutmaster will also want to know what things you do well." *Id*. at 82-83.  This partial list of explicit misrepresentations is not exhaustive.

27.

Defendant utilized BSA's promotion materials, handbooks, and other documents, thus adopting BSA's explicit misrepresentations as their own.

28.

Prior to and during Plaintiff's abuse, Defendant and BSA also conveyed the aforementioned misrepresentations through silence because they never warned the Scouting community, including Plaintiff, his parents, and the general public that adult Scout volunteers were not always safe and trustworthy, that they might make sexual advances, or that significant numbers of them had abused boys in the past.  This partial list of omissions is not exclusive.

29.

Defendant and BSA made these misrepresentations with the intent of inducing Plaintiff

**COMPLAINT - 11**

(and other children similarly situated), Plaintiff's parents (and other parents and guardians similarly situated), and the public to rely on Defendant and BSA's misrepresentations so that they would continue to trust Scouting and adult Scout volunteers, and continue to participate in Scouting.  Defendant and BSA also made the misrepresentations with the intent of shielding Scouting from scrutiny to ensure that children continued to join, to benefit Defendant and BSA's financial positions and reputations.

30.

Defendant and BSA knew the representations about Scouting, Scout leaders in general, and Libey, Arnold, and Elliott, specifically, were false, or made the misrepresentations with reckless disregard for the truth.

31.

Defendant and BSA's knowledge of the dangers and prevalence of child sexual abusers in Scouting and specific knowledge of the sexual abuse accusations against Libey, Arnold, and Elliott constituted a material fact.  Had Plaintiff and his parents been aware of such dangers, Plaintiff would not have entered into a relationship, or would not have continued a relationship, with Defendant and Scouting, or would have taken steps to protect themselves from being abused while in Scouting.

32.

Plaintiff and his parents justifiably and reasonably relied on Defendant and BSA's misrepresentations by allowing Plaintiff to join Scouting, remain in Scouting, and engage in a trust relationship with their Scout leaders.  Their reliance was justified because Plaintiff and his parents could not investigate Defendant and BSA's claims that Scout volunteers were safe and trustworthy, given that the records that would disprove the fraud — *e.g.* BSA's IV files — were

**COMPLAINT - 12**

not available to the public until decades later; and Plaintiff and his parents did not know of Defendant and BSA's knowledge of abusers.

## MARK DOE 14'S ABUSE

33.

Plaintiff realleges and incorporates by reference paragraphs 1-33.

34.

At all relevant times, Plaintiff Mark Doe 14 was a child involved in Scouting.  Plaintiff was involved in Cub Scouts and was a Boy Scout member of Troop 33, in Gooding, Idaho, all between approximately 1970 and 1980.  At all relevant times, Plaintiff was under the care, custody, protection, and/or responsibility of Defendant and BSA.

35.

At all relevant times, Defendant and BSA selected and appointed David Oakley as an adult leader and volunteer for Plaintiff's Troop.  On information and belief, Oakley was the Assistant Scoutmaster for Troop 33, and Fred Locke was the Scoutmaster.

36.

At all relevant times, on information and belief, Plaintiff's Troop 33 was sponsored by the United Methodist Church in Gooding, Idaho.  The troop held weekly meetings and other Scouting activities at that Church.

37.

Oakley began sexually abusing Plaintiff in or around 1976 or 1977, when Plaintiff was 11 or 12 years old.  The first incident occurred at Oakley's house; plaintiff was there to ostensibly work on merit badge activities.  Oakley tied Plaintiff's wrists together, forced Plaintiff to the bedroom, and anally raped Plaintiff.  Oakley threatened to kill Plaintiff's entire family if Plaintiff

told anyone about the event.  On two subsequent occasions, during Scouting-sponsored camping trips, Oakley tried to get Plaintiff to sleep in Oakley's sleeping bag and attempted to molest him both times.  Other grooming and abusive events occurred at the Methodist Church, in Oakley's car on the way to and from Scouting activities, and at Scout camps.

38.

As a direct and proximate result of Defendant 's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff was seriously injured, and such injuries prevail and will continue to prevail for an indefinite time into the future.  The injuries include but are not limited to physical and emotional pain and suffering, mental anguish, and disability, and are permanent, progressive, and disabling.  His damages include general damages and such other damages as are shown by the evidence, to be proved at the time of trial, in an amount now unknown.

39.

Within the past three years Plaintiff discovered and continues to discover that, throughout the time he was involved in the Scouting program, Defendant perpetrated a fraud related to the dangers of Scout leaders sexually abusing children in the Scouting program.  Prior to Plaintiff's discovery of Defendant's fraud, Plaintiff did not know and could not know that Defendant's misrepresentations, or lack thereof, regarding the trustworthiness of Scout leaders and the safety of the Scouting program were false, and that Defendant knew the Scouting program was structured in such a way that sexual abuse of Scouts by Scout leaders was certain to occur to some degree within the Scouting program.

/ / /

/ / /

**COMPLAINT - 14**

## FIRST CLAIM FOR RELIEF
### *Fraud*

40.

Plaintiff realleges and incorporates by reference paragraphs 1-39.

41.

As alleged above, Defendant committed fraud by active concealment.

42.

As alleged above, Defendant committed fraud by conduct and through explicit language.

43.

As alleged above, Defendant had a duty to disclose its knowledge of the sexual abuse

history in Scouting and the risk that Scouts such as Plaintiff could be sexually abused by his

Scout leaders, to Plaintiff.

44.

As alleged above, Defendant committed fraud through nondisclosure.

45.

As a direct result and consequence of Defendant's fraud, Plaintiff suffered the injuries

and incurred the damages described in paragraph 38.

## SECOND CLAIM FOR RELIEF
### *Constructive Fraud*

46.

Plaintiff realleges and incorporates by reference paragraphs 1-45.

47.

As alleged above, Defendant committed constructive fraud.

/ / /

**COMPLAINT - 15**

48.

As a direct result and consequence of Defendant's constructive fraud, Plaintiff suffered

the injuries and incurred the damages described in paragraph 38.


**WHEREFORE**, Plaintiff prays for judgment as follows:

1.      Non-economic damages and such other damages as are shown by the evidence by

Defendant Mountain West Council for Plaintiff, the exact amounts to be determined by the jury

at the time of trial;

2.      For Plaintiffs' disbursements and incurred costs;

3.      Attorney fees; and

4.      For any other relief, this Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

DATED this ___ day of July, 2021.


*/s/ Gilion C. Dumas*
Gilion C. Dumas, ISB #8176
**DUMAS & VAUGHN, LLC**

Andrew M. Chasan, ISB #2100
Timothy C. Walton, ISB #2170
**CHASAN & WALTON, LLC**

*Attorneys for Plaintiff*


**COMPLAINT - 16**